IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

ANDERSON DIVISION

| | |
|---|---|
| Taylor Stone Witt, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>Cable Ad Concepts, Inc. and )<br>Northland Communications Corp. )<br>)<br>Defendants. )<br>) | Civil Action No. 8:08-3778-HFF-WMC<br><br>**REPORT OF MAGISTRATE JUDGE** |

This matter is before the court on the defendants' motion for summary judgment. The plaintiff is now proceeding *pro se*; however, she was represented by an attorney at the time she filed her amended complaint. In her amended complaint, the plaintiff alleged claims for discrimination, harassment, and retaliation under the Age Discrimination in Employment Act ("ADEA") and state law claims for negligent misrepresentation, breach of contract, and promissory estoppel.[1]

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

The defendants filed their motion for summary judgment on October 15, 2009. On October 23, 2009, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the plaintiff was advised of the summary judgment procedure and the possible consequences

---

[1]The plaintiff claims a fifth claim for "personal injury due to stress that has resulted in high blood pressure" was included in the amended complaint. However, such a claim is not included in the amended complaint filed with the court and served on the defendant. *See* doc. no. 36 and def. m.s.j. at 1 n.1.

if he failed to respond adequately. On November 2, 2009, the plaintiff filed her response in opposition to the motion for summary judgment.

## **FACTS PRESENTED**

The plaintiff had just turned 45 years old and was looking for a job in the summer of 2006 when she heard that defendant Cable Ad Concepts ("CAC") was looking to hire people in Greenwood, South Carolina (pl. dep. at 60, 68). She was contacted by Steve Hudgins, the Regional Advertising Manager for CAC, who told her CAC was taking over the cable advertising for defendant Northland Cable Communications Corporation in the Greenwood market, and he was considering the plaintiff for the manager's job (*id.* at 60-61). Hudgins asked if the plaintiff was interested in the job, and they agreed to meet at a social event in Greenwood in June 2006 (*id.* at 61-64). Hudgins told the plaintiff that the job would not start until January 2, 2007, but no job offer was made at the June 2006 social event (*id.* at 64-65).

Hudgins called the plaintiff again in mid-October 2006 and asked her to meet with his boss, Lee Johnson, the Divisional Vice President for Northland Communications, the parent of CAC[2] (*id.* at 66). During that meeting, the plaintiff learned that CAC was going to fill three positions in Greenwood – two Account Executives and one Ad Sales Manager (*id.* at 70). The plaintiff also learned that Dan Smyth,[3] the sales manager with the predecessor company, had been offered the position of Ad Sales Manager with CAC, but had turned down that position, instead accepting a job as an Account Executive (i.e., sales) (*id.* at 66-67). After the plaintiff's interview, Hudgins told the plaintiff he would be interviewing candidates for two more weeks, and if he did not find someone with more

---

[2]Both Hudgins and Johnson are older than the plaintiff (pl. dep. at 128).

[3]Smyth is nine years older than the plaintiff (*id.* at 68).

2

experience, the Ad Sales Manager's job was hers. Hudgins told the plaintiff he would notify her if he found someone with more experience (*id.* at 70-71). Finally, Hudgins told the plaintiff she might not hear from him again until after Thanksgiving as the holiday season was going to be very busy (*id.* at 73).

Johnson recalls that Hudgins came to him when Johnson was visiting Greenwood and said he (Hudgins) had a "dynamic young lady" (referring to the plaintiff) he wanted to consider for the start-up of the Greenwood office (Johnson dep. at 6). During Johnson's interview with the plaintiff, he was very impressed with her vast experience (*id.*). The plaintiff told Johnson she could "sell ice to an Eskimo," and the plaintiff impressed Johnson with the number of people she knew in Greenwood (*id.* at 6-7). In his deposition, Johnson commented:

> So after the interview I told Steve, I said, that's your salesperson right there. I said she'll make us a lot of money and her a lot of money. And she had told me about how she knew everybody. She named off a bunch of businesses and named the managers. I was very impressed with that. And Steve had told me how, you know, in meeting at a block party or something that she had introduced him to a lot of the business leaders in the community. And that's what it really takes to sell is knowing the community, knowing the leaders and knowing the businesses. And so I really thought that Ms. Witt would hit the ground running and do really well. Most cases – not most cases, not every case, but most cases our top salespeople will make much more than the managers, you know.

(*Id.* at 7). Later in his deposition, in discussing his thought process in the aftermath of the plaintiff's interview, Johnson noted: "I thought if we put Taylor and Dan Smith [sic] on the road out there, that we'd really generate a lot of sales in a short period of time, and that's what I really needed from a budget standpoint" (*id.* at 14).

Similarly, Hudgins recalls that when he first met the plaintiff at a block party in Greenwood he was quite impressed with the number of people she knew and introduced him to in the community (Hudgins dep. at 6-7). Hudgins knew the company was looking to

3

fill three positions in the Greenwood start-up – one Ad Sales Manager and two Account Executives (*id.* at 8). He and Johnson were very impressed during the plaintiff's interview (*id.* at 10). After the interview, Hudgins and Johnson discussed the plaintiff:

> Well, after the interview I went back in and talked to Lee. And Lee said she could sell ice to an Eskimo. She said she could sell this person, I could sell that person, and at that point Mr. Johnson said she'd make us a great salesperson. And so that's pretty much how we determined we were going to move forward, we were going to have two really good salespeople out there and then I was looking for a manager after that.

(*Id.* at 11).

After the interview, the plaintiff did not hear from anyone at CAC, so sometime after Thanksgiving, the plaintiff called Hudgins to see if everything was still on track for the January start date (pl. dep. at 73). Hudgins assured the plaintiff that everything was on schedule for a January start (*id.* at 74). The plaintiff claims that Hudgins told her at that time that he had hired a woman named Jennifer for the Account Executive position (pl. resp. m.s.j. at 19).[4]

According to the plaintiff, Hudgins asked her to fill out hire paperwork, take a drug test, and submit information for a background check on or about December 4, 2006. According to emails submitted by the plaintiff, the necessary paperwork was complete by December 12, 2006 (pl. resp. m.s.j., ex. A). At that time, the only position that had been discussed with the plaintiff was the Ad Sales Manager position (pl. resp. m.s.j. at 23).

During the last week of December, Hudgins called the plaintiff and asked her to meet him for lunch (*id.* at 75). Hudgins said he had hired someone else for the management position, but he offered the plaintiff the Account Executive (sales) position (*id.* at 75-76, 88). Hudgins assured the plaintiff that most salespeople make more money than managers and that the management job was just a "figurehead" (*id.* at 76). In accepting the

---

[4]The plaintiff did not submit any deposition testimony or other evidence on this point.

4

sales position, the plaintiff acknowledged: "Steve says I have an opportunity to make some considerable money here. I'm going to make this work" (*id.* at 81).

The plaintiff accepted the offer of the position as an Account Executive (*id.*). Both Johnson and Hudgins were excited about the plaintiff accepting the position, and both were "enthusiastic" about her being a part of the team (*id.* at 89). At no time before or during the interview process did anyone make any negative age-related comments to the plaintiff (*id.* at 89-90).

The plaintiff's employee status form states that she would earn a base salary of $12,480 per year; she would receive a commission of 11% on all her sales, and she would receive an additional commission of 3.25% if her sales exceeded $120,000 (*id.* at 123-25; def. m.s.j., ex. E). Dan Smyth, the other Account Executive, who is nine years older than the plaintiff, was to receive a base salary of $16,640 per year, a commission of 11% of all sales, and an additional commission of 3.25% if his sales exceeded $180,000 (pl. dep. at 185-86; def. m.s.j., ex. F). Finally, Jennifer Wright, the 26-year-old female hired as the Ad Sales Manager, was to receive a base salary of $20,000 per year, a commission of 3% of all office sales, and an additional commission of 1.25% if her office met budget (pl. dep. at 125-27, 184-85; def. m.s.j., ex. G).

The employee status forms submitted by the defendants for the Greenwood employees show that Hudgins signed the paperwork for the plaintiff in the Account Executive position on December 4, 2006. There is no date by the plaintiff's signature (def. m.s.j., ex. E). The form for Wright in the Ad Sales Manager position shows no date for Hudgins' or Wright's signatures, but the Divisional Vice President signed on December 8 and the President signed on December 11, 2006 (*id.*, ex. G). The plaintiff claims she filled out paperwork for the Ad Sales Manager position on December 4, 2006, and the document was later altered to reflect the Account Executive position. She further claims that Wright

5

was initially hired into the Account Executive position, and her paperwork was later altered to reflect the Ad Sales Manager position (pl. resp. m.s.j. at 19).

The plaintiff testified to many problems that she encountered during her three months of work with CAC. For example, she did not appreciate the "tone" Wright, the Ad Sales Manager, used in speaking with her (pl. dep. at 130). It irritated her that Wright, in discussing matters with her, continually commented that with all her (the plaintiff's) experience, she should have known this or that (*id.* at 155). The plaintiff was offended when, during a presentation, Tiffany Guerro, the Ad Sales Manager in Statesboro, Georgia, told the participants (including the plaintiff) that they were to be perfectly groomed and were to be fresh and beautiful when they went out and faced the world (pl. dep. at 162). The plaintiff was also offended that she was the only person who went without a working computer until Pam Piazza solved that for her during a training session in Statesboro, Georgia (*id.* at 219-21). The plaintiff complained that she did not have quality contractors to do advertising production work for her clients, although she later acknowledged that a younger person in her position would have had the same production problems (*id.* at 225-28, 248). The plaintiff had problems getting information for her clients, and she believed that Wright was "sabotaging" her because of her age (*id.* at 305). However, she testified that Smyth, who is nine years older than her, did not have the same problems (*id.* at 307-308). The plaintiff stated that Wright was not disrespectful to Smyth and did not treat Smyth the same way she treated her (*id.* at 327-28).

Dan Smyth testified that he, too, had frustrations over production problems, problems with the volume of the commercials on television, problems getting information, and problems with production quality (Smyth dep. 37-39). However, Smyth never felt Wright discriminated against him because of his age (*id.* at 37). He never heard or saw any

6

CAC manager do or say anything that he perceived as discrimination on the basis of age (*id.* at 37). While he acknowledges that Wright struggled in her job at first, things got better (*id.* at 36). Similarly, while Smyth acknowledged that the plaintiff had a higher number of problems with her accounts than he did, he never had the perception that this was intentional or someone was making trouble for the plaintiff (*id.* at 40). Finally, while he acknowledged that the plaintiff was sometimes difficult to work with, he thought she was doing "okay" at her job during the three months that she was there (*id.* at 33, 52).

On the morning of April 3, 2007, Wright and Hudgins asked the plaintiff to speak with them (pl. dep. at 302). In that meeting, Wright and Hudgins shared with the plaintiff their evaluation of her first three months of employment (def. m.s.j., ex. H). Hudgins commented to the plaintiff that she didn't "look happy" (pl. dep. at 302). The plaintiff shared with Hudgins and Wright that on the previous evening (April 2, 2007), she had prepared a letter laying out her complaints about the job, production problems she was having, not getting answers to questions and, in general, her problems working with Wright (def. m.s.j., ex. I). The plaintiff handed Wright and Hudgins the letter and confirmed that she was not happy (pl. dep. at 302). Nowhere in the letter does the plaintiff complain that her problems were in any way related to her age (def. m.s.j., ex. I). The plaintiff then went on to explain to Hudgins and Wright the problems she was having on the job as set forth in her letter (pl. dep. at 302-306).

At the close of the letter, the plaintiff made the following statement: "I need this resolved or consider this my 2 weeks notice effective immediately" (def. m.s.j., ex. I). Hudgins asked the plaintiff to give him two weeks to look into the matter to see if things could be worked out (pl. dep. at 305-306). The next morning, Hudgins told the plaintiff he had looked at her letter and he had evaluated Wright's conduct, and Wright had done what he asked her to do (*id.* at 313). He told her that it was best if she and the company parted

7

ways and that he would pay her for two weeks (*id.* at 313-14). Accordingly, April 3, 2007, was the plaintiff's last day of work.

## **APPLICABLE LAW**

Federal Rule of Civil Procedure 56(c) states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id*. at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the non movant and in favor of the non moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. V. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Rather, the non-moving party must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id*. At 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's

8

positions is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Furthermore, Rule 56(e) provides in pertinent part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e). Accordingly, when rule 56(e) has shifted the burden of proof to the non-movant, he must produce existence of every element essential to his action that he bears the burden of adducing at trial on the merits.

## **ANALYSIS**

The defendants have moved for summary judgment on the plaintiff's claims for denial of the Ad Sales Manager job, constructive discharge, retaliation, and harassment because of her age in violation of the ADEA. "[A] plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." *Gross v. FBL Fin. Servs., Inc.*, 129 S.Ct. 2343, 2352 (2009). Under the alternative burden-shifting method of proof of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973),[5] a plaintiff may establish

---

[5]As noted by the defendants, the Supreme Court recently found that the text of the ADEA does not authorize a mixed-motive age discrimination claim. *Gross*, 129 S.Ct. at 2350. The Court
(continued...)

9

a *prima facie* case of age discrimination under the ADEA by showing that: (1) she is a member of the protected class; (2) her employer took an adverse employment action against her; (3) she was qualified or she was performing her job to the legitimate expectations of her employer; and (4) someone else was hired or she was either replaced by someone outside the protected class or similarly-situated employees outside of her protected class were treated more favorably. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir.2004).

If the plaintiff can establish a *prima facie* case, the burden then shifts to the defendant to produce a legitimate, nondiscriminatory reason for its actions against the plaintiff. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981) (this is a burden of production, not persuasion). If the defendants meet this burden, the plaintiff must show by a preponderance of the evidence that the proffered reason was pretextual. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000).

### *Denial of Position as Ad Sales Manager*

The plaintiff first alleges that the defendants discriminated against her by giving the Ad Sales Manager position to Wright, who was younger and had less experience and qualifications for the job than she did. The evidence shows that CAC was initiating a start-up business, and they needed to fill three positions: two Account Executives and one Ad Sales Manager (Hudgins dep. at 8). The most critical aspect of this start-up operation was putting solid salespeople (Account Executives) in the field to generate sales (Johnson

---

[5](...continued)
also noted that it "has not definitively decided" whether the *McDonnell Douglas* framework, first developed in the context of Title VII cases, "is appropriate in the ADEA context." 129 S.Ct. at 2349. Accordingly, this court must follow Fourth Circuit precedent, which applies the *McDonnell Douglas* framework to ADEA claims. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.,* 354 F.3d 277, 285 (4th Cir.2004). *See also Misner v. Potter*, 2009 WL 1972598, *2 n. 3 (D. Utah 2009) ("This court does not understand *Gross* as altering the use of the *McDonnell Douglas* framework at summary judgment on ADEA cases.").

dep. at 7-8). The plaintiff was only one of the candidates considered for all three of these positions. The plaintiff interviewed with both Hudgins and Johnson. Both were impressed with the plaintiff's contacts within the Greenwood community and her apparent ability as a salesperson, and they testified that they made the decision to offer her the Account Executive job immediately after her interview. The uncontradicted testimony of the two persons who were primarily responsible for interviewing the plaintiff is that they concluded that her skill set made the Account Executive position the perfect fit for her. Both Johnson and Hudgins testified that age was never a factor in the decision to hire the plaintiff.

The plaintiff argues that the defendant originally hired her for the Ad Sales Manager position and Wright for an Account Executive position. She contends that the defendants then switched the positions in December 2006 because they "'liked the other woman better' which could not be because of Wright's experience because she did not have any experience" (pl. resp. m.s.j. at 20). The plaintiff further contends that the person who replaced her in the Account Executive position was a woman in her twenties (*id.* at 21).

The plaintiff can establish a *prima facie* case of disparate treatment. However, she has failed to come forward with any evidence that the defendants' stated reason for hiring her for the Account Executive position rather than the Ad Sales Manager position was pretext for age discrimination. Viewing the evidence in a light most favorable to the plaintiff, she can show that Wright was younger and had less experience than her, and she can show that the decision to place Wright in that position was made after the defendants had discussed the position with the plaintiff for several months. However, the plaintiff acknowledges that both Johnson and Hudgins were "excited" about her coming on board as a salesperson (pl. dep. at 88-89). She stated in her deposition that she "wouldn't think they [Johnson and Hudgins] would look at [her] negatively because of [her] age" (*id.* at 89). She just did not "understand why they would hire somebody with no experience in the position that I interviewed for, applied for, and discussed, only discussed" (*id.*). The

11

defendants argue that the plaintiff was hired for the Account Executive position because it was the best fit for her given her contacts in Greenwood and abilities as a salesperson. Notably, Dan Smyth, the other Account Executive hired at the same time as the plaintiff, turned down CAC's offer of the Ad Sales Manager's job because he could make more money in sales (pl. dep. at 67-68). The fact that Smyth, who is nine years older than the plaintiff, was initially offered the manager's job, combined with the fact that both of the critical decision makers were older than the plaintiff, further undercuts any argument that the plaintiff's age played any role in the decision to hire her as an Account Executive and Jennifer Wright as the Ad Sales Manager. *See McGinnis v. Union Pacific R.R.*, 496 F.3d 868, 875 (8th Cir. 2007); *Jeffers v. Lafarge N. Am., Inc.*, 622 F. Supp. 2d 303, 320 (D.S.C. 2008). Based upon the foregoing, the claim fails.

### *Constructive Discharge*

To establish constructive discharge, the plaintiff must "allege and prove two elements: (1) the deliberateness of [the Company's] actions, motivated by [age] bias, and (2) the objective intolerability of the working conditions." *Honor v. Booz-Allen & Hamilton, Inc.,* 383 F.3d 180, 186-87 (4th Cir. 2004). *See also Bristow v. The Daily Press*, 770 F.2d 1251, 1255 (4th Cir. 1985). The plaintiff cannot establish either of these elements. None of the plaintiff's asserted problems, either individually or collectively, rise to the level of "intolerable" working conditions sufficient to support a constructive discharge claim. *See, e.g., Williams v. Giant Food Inc.*, 370 F.3d 423, 434 (4th Cir. 2004) ("[Plaintiff] alleged that her supervisors yelled at her, told her she was a poor manager and gave her poor evaluations, chastised her in front of customers, and once required her to work with an injured back. We agree with the district court that these allegations, even if true, do not establish the objectively intolerable working conditions necessary to prove a constructive discharge.").

In order to make out a claim for constructive discharge, an employee must present evidence of such deleterious working conditions that a jury could conclude that a reasonable person would have felt compelled to resign their position. *Bristow*, 770 F.2d at 1255. Merely presenting evidence of difficult working conditions is not enough. *Id. See also Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994) ("Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign."). Rather, the working conditions must be so intolerable that a reasonable person would have felt compelled to resign. The allegations raised by the plaintiff do not rise to this level.

Additionally, the plaintiff must establish the deliberateness of the defendants' actions. Deliberateness only exists if the actions complained of were "motivated by [age] bias," *Honor*, 383 F.3d at 187, and "were intended by the employer as an effort to force the employee to quit." *Bristow,* 770 F.2d at 1255 (citations omitted). The plaintiff has adduced no evidence that the company engaged in efforts to force her to quit. On the contrary, in her resignation letter, she did not even indicate that she subjectively felt forced to quit due to her age (pl. dep. at 130, ex. I).

Not only must the plaintiff present evidence of intolerable working conditions and deliberateness of the employer's actions, but she must also present evidence that she was subjected to these adverse working conditions because of her age. *Alba v. Merrill Lynch & Co.*, 198 Fed. Appx. 288, 294 (4th Cir. 2006) (citing *Honor*, 383 F.3d at 180). In support of her opposition to the motion for summary judgment, the plaintiff produced an e-mail that she, along with two other people, received from Wright entitled "Senior Dress Code." The e-mail states as follows:

> **Senior Dress Code**
> Many of us "Older Folks" (those over 50, WAY over 50, or hovering near 50) are quite confused about how we should present ourselves. We are unsure about the kind of image we are projecting and whether or not we are correct as we try to

13

> conform to current fashions. Despite what you may have seen
> on the streets, the following combinations DO NOT go together
> and should be avoided:
> 1. a nose ring and bifocals
> 2. spiked hair and bald spots
> 3. a pierced tongue and dentures
> 4. miniskirts and support hose
> 5. ankle bracelets and corn pads
> 6. Speedos and cellulite
> 7. a bellybutton ring and a gall bladder surgery scar
> 8. unbuttoned disco shirts and a heart monitor
> 9. midriff shirts and a midriff bulge
> 10. bikinis and liver spots
> 11. short-shorts and varicose veins
> 12. inline skates and a walker
> And last, but not least
> 13. thongs and Depends.

(Pl. resp. m.s.j., ex. B). Accompanying the email is a picture of an older woman in short shorts. As argued by the defendants, one isolated email is hardly a "smoking gun" for invidious discrimination. *See, e.g., Ziskie v. Mineta*, 547 F.3d 220, 228 (4th Cir. 2008) ("The occasional off-color joke or comment is a missive few of us escape. Were such things the stuff of lawsuits, we would be litigating past sundown in ever so many circumstances."); *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999) ("Thus, to prove discriminatory animus, the derogatory remark cannot be stray or isolated and 'unless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of [discrimination].'") (citations omitted).

Here, the plaintiff cannot show that the problems she faced during her employment with CAC existed "because of" her age. Smyth testified he never saw the plaintiff treated differently because of her age (Smyth dep. at 37). Furthermore, nowhere in her letter to Wright and Hudgins does the plaintiff even hint that it was her belief that she was being subjected to intolerable working conditions because of her age (pl. dep. at 130, ex. I).

Based upon the foregoing, the plaintiff's claim for constructive discharge fails.

14

*Retaliation*

The plaintiff claims that she was discharged "in retaliation for complaining about the age discrimination and harassment" (amended comp. at 3). In order to make out a *prima facie* case of retaliation under the ADEA, the plaintiff must present some evidence that she engaged in protected activity, the employer took adverse employment action against her, and a causal connection existed between the protected activity and the adverse action. *McNairn v. Sullivan*, 929 F.2d 974, 980 (4th Cir. 1991). Protected activity may be in the form of participation in the charge filing process or protesting unlawful age discrimination in the work place. *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998).

Here, as argued by the defendants, the plaintiff did neither. The plaintiff did not raise the issue with her superiors until after she left employment. Even in her letter presented to Wright and Hudgins on her last day of work, the plaintiff did not mention the issue of age discrimination (def. m.s.j., ex. I). The plaintiff argues in her opposition to the motion for summary judgment that she "reported the Age Discrimination and willful pervasive harassment to all management including Human Resource Manager Rheta Angeles at Corporate in Seattle WA and received no response" (pl. resp. m.s.j. at 21). However, there is no evidence before the court of such a complaint *before she left employment* with CAC. It was not until after the defendant CAC accepted her resignation that the plaintiff first raised the allegation of age discrimination. Likewise, the plaintiff never participated in the charge filing process until after she had resigned.

In the absence of evidence of participation in some form of protected activity, the plaintiff cannot support a claim of retaliation. *Prince-Garrison v. Md. Dep't of Health & Mental Hygiene*, 317 Fed. Appx. 351, 354 (4th Cir. 2009) ("To establish a *prima facie* case of retaliation, [the plaintiff] must prove that she engaged in a protected act . . . ."). Based upon the foregoing, this claim fails.

15

***Harassment***

The plaintiff claims she was harassed because of her age. Specifically, she alleges:

> Plaintiff was subjected to severe, pervasive, unwelcome and unwanted harassment that created a hostile work environment. Such harassment was due to her age as the other co-workers were not subjected to the same harassment. . . . Due to the harassment and Defendant's failure to correct it, Plaintiff endured extreme emotional distress and physical distress. The harassment and the distress Plaintiff endured was more than any reasonable person could be expected to endure.

(Amended comp. at 3). "To make out a hostile work environment claim under the ADEA, a plaintiff must adduce evidence that "'(1) [s]he experienced unwelcome harassment; (2) the harassment was based on h[er]. age; (3) the harassment was sufficiently severe or pervasive to alter the conditions of h[er] employment and to create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer.'" *Wells v. Gates*, 336 Fed. Appx. 378, 386-87 (4th Cir. 2009) (quoting *Baqir v. Principi*, 434 F.3d 733, 745-46 (4th Cir. 2006)). Isolated comments or incidents are insufficient to satisfy this burden. *Graham v. Prince George's County*, 191 Fed. Appx. 202, 204 (4th Cir. 2006) ("[A]lthough such facts reflected an unpleasant working environment, they did not support a hostile one based on an unlawful characteristic."); *Shirer v. Tri-County Elec. Co-op., Inc.*, 2009 WL 2900767, *8 (D.S.C. Sept. 9, 2009) ([T]he ADEA [is] not [a] 'general civility code.'") (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U. S. 75, 80 (1998)). In determining whether allegations of harassment are severe and pervasive, the court must examine the totality of the circumstances, including "'[t]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753 (4th Cir. 1996) (quoting *Harris*, *v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

16

As discussed above, the plaintiff's claims center on problems she had getting answers for her clients, problems with the quality of vendors used to produce advertisements, and problems with her manager's "tone" when she spoke to the plaintiff. These do not constitute the type of severe and pervasive conduct required by the courts to make out a claim of harassment. *See, e.g., EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) ("Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard."); *Graham*, 191 Fed. Appx. at 204 ("[The plaintiff] claims points to the reprimands from [her supervisor] regarding her performance and the harsh way in which [her supervisor] communicated (or refused to communicate). The district court determined that, although such facts reflected an unpleasant working environment, they did not support a hostile one based on an unlawful characteristic. . . ); *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) ("[T]he facts she alleges merely tell a story of a workplace dispute regarding her reassignment and some perhaps callous behavior by her superiors. They do not describe the type of severe or pervasive . . . age based activity necessary to state a hostile work environment claim."); *Burns v. AAF-McQuay, Inc.*, 166 F.3d 292, 295 (4th Cir. 1999) ("[The plaintiff] has forecast no evidence tending to show that the asserted offensiveness of the working environment at [CAC] was sufficiently severe or pervasive . . . . Thus the only comments properly attributed to [the plaintiff's] age are [her supervisor's] inquiry concerning her plans for retirement, his reference to her acting like a child, and perhaps his comment that [the plaintiff] did not fit in with his group.").

Furthermore, the plaintiff has failed to show that the alleged harassment was based upon her age. In support of her age harassment claim, the plaintiff proffers two emails sent to her by Wright. The first, discussed above, is an email entitled "Senior Dress Code" (pl. resp. m.s.j., ex. B). The other is a picture of an overweight female trying to

17

buckle a pair of pants. The caption reads, "Need help squeezing the most out of your advertising budget? Call Taylor Stone." (*id.*). Considering the totality of the circumstances, including the frequency and severity of the alleged conduct, the plaintiff's evidence is far from the type of severe and pervasive conduct based upon her age required to make out a *prima facie* case of harassment. *See Martin v. Scott & Stringfellow, Inc.*, 643 F.Supp.2d 770, 787 (E.D. Va. 2009) (finding "[t]wo instances of harassing conduct, neither of which were threatening or particularly abusive and neither of which interfered with [the plaintiff's] work performance, are simply insufficient to support a hostile work environment claim."). Based upon the foregoing, this claim fails.

***State Law Claims***

The remaining claims against the defendants are all state law causes of action (negligent misrepresentation, breach of contract, and promissory estoppel). The court should decline to exercise supplemental jurisdiction over the plaintiff's state law claims as it is recommended that summary judgment be granted on the federal claims. *See* 28 U.S.C. § 1367(c); *see United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966).

**CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, it is recommended that the defendants' motion for summary judgment (doc. no. 70) be granted.

                                                s/William M. Catoe
                                                United States Magistrate Judge

April 29, 2010

Greenville, South Carolina